1



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

F I L E D
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JAN 5 2007

DAVID J. MALAND, CLERK

DEPUTY

COOPERVISION, INC.        *   DOCKET 2:06CV149
                          *
                          *   2:00 P.M.
V.                        *
                          *   JANUARY 3, 2007
                          *
CIBA VISION CORPORATION   *   BEAUMONT, TEXAS

------------------------------------------------------------

LUFKIN DIVISION

COOPERVISION, INC.        *   DOCKET 9:06CV260
                          *
                          *   2:00 P.M.
V.                        *
                          *   JANUARY 3, 2007
                          *
CIBA VISION CORPORATION   *   BEAUMONT, TEXAS

------------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 46

REPORTER'S TRANSCRIPT OF SCHEDULING CONFERENCE

BEFORE THE HONORABLE RON CLARK
UNITED STATES DISTRICT JUDGE

------------------------------------------------------------

FOR THE PLAINTIFF:        J. THAD HEARTFIELD
                          LAW OFFICE OF J. THAD HEARTFIELD
                          2195 DOWLEN ROAD
                          BEAUMONT, TEXAS  77706


                          CLAYTON E. DARK, JR.
                          ATTORNEY AT LAW
                          POST OFFICE BOX 2207
                          LUFKIN, TEXAS  75902-2207



2

```
 1  FOR THE PLAINTIFF (CONT'D):
                                 JASON G. SHEASBY
 2                               IRELL & MANELLA
                                 1800 AVENUE OF THE STARS
 3                               SUITE 900
                                 LOS ANGELES, CALIFORNIA  90067
 4

 5                               DANIEL G. MCBRIDE (CLIENT REP.)
                                     (BY TELEPHONE)
 6

 7

 8  FOR THE DEFENDANT:          LAWRENCE L. GERMER
                                CHARLES W. GOEHRINGER, JR.
 9                              GERMER GERTZ
                                550 FANNIN, SUITE 500
10                              BEAUMONT, TEXAS  77701

11
                                V. BRYAN MEDLOCK, JR.
12                              MICHAEL HATCHER
                                SIDLEY AUSTIN
13                              717 N. HARWOOD, SUITE 3400
                                DALLAS, TEXAS  75201
14

15                              ROBERT GORMAN (CLIENT REP.)
                                    (BY TELEPHONE)
16

17                              SCOTT MEESE (CLIENT REP.)
                                    (BY TELEPHONE)
18

19

20

21

22
           PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
23         TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

24

25
```

3

1               [COURT REPORTER'S NOTES COOPERVISION V. CIBA\1-3-07

2   HEARING, 2:00 P.M., WEDNESDAY, JANUARY 3, 2007, BEAUMONT,

3   TEXAS, JUDGE CLARK PRESIDING]

4               [OPEN COURT, ALL PARTIES PRESENT]

5               THE COURT:  All right.  I call *CooperVision versus*

6   *CIBA Vision Corporation* -- actually, there are two cases here,

7   the first case, or the old case, 2:06cv149, and then the second

8   case, or I may also refer to it as the new case, 9:06cv260.

9               Who is here for Plaintiffs?

10              MR. HEARTFIELD:  Good afternoon, Judge.  Thad

11  Heartfield, Jason Sheasby, and Clay Dark for CooperVision.  And

12  I believe attending by phone is our client representative,

13  Daniel McBride.

14              THE COURT:  Are you there, Mr. McBride?

15              MR. MCBRIDE:  Yes, I'm here.

16              THE COURT:  Okay.  And for Defendants?

17              MR. GERMER:  For CIBA Vision, Larry Germer and

18  Charlie Goehringer.  And with speaking roles, Bryan Medlock and

19  Mike Hatcher.  And I think there is someone that is going to

20  join us maybe later by phone; but he's not on yet, if I

21  understand it correctly.

22              THE COURT:  Okay.

23              MR. GERMER:  And that would be another attorney

24  with Mr. Medlock's firm.

25              THE COURT:  All right.  I guess we've got a couple

4

1  questions here.  There was a motion to consolidate the two

2  cases.  And I guess this gets into a number of different

3  issues; but one of them is -- is that now, as I count it,

4  there's, I think, 101 or 102 claims at issue divided up into, I

5  guess, two groups of patents, the edge design patents and the

6  toric design patents.  There's the '903, '740 and '746, the

7  original toric patents; and then there is the '174 and the

8  '753, the new toric patents.

9            And I don't see how logically myself or anyone else

10  is going to have a *Markman* Hearing on a hundred different

11  claims, and I'm positive that nobody is going to try a case

12  before a jury with a hundred different claims.  I am looking

13  very seriously at some Orders Judge Folsom put out limiting the

14  number of claims or requiring Plaintiff to make a choice or an

15  election at some point as to the number of claims.  The other

16  possibility is dividing it up into two cases, the edge design

17  patent case and the toric case.  It does seem to make some

18  sense to have all of the torics together, so...

19            Let me hear from Plaintiff.  I mean, I understand

20  there's obviously some benefits and savings of handling it all

21  at once.  And, yes, they are all dealing with, you know, a

22  group of contact lenses; but -- and I think we discussed this

23  at the management conference on the first case.  There were a

24  lot of claims out there already.  Now we've just added some

25  more.

5

1       MR. SHEASBY:  Yes, your Honor.

2       Can you run the presentation, please?  Thank you

3   very much

4       Your Honor, you are correct.  I think there are

5   approximately 100 claims at issue right now.  There's, I think,

6   two salient points to recognize about that fact.  One is, it is

7   CooperVision's understanding that we have an obligation under

8   the Federal Rules and under the Patent Rules to --

9       Should I push the button?

10      DEPUTY CLERK:  Yes.  There you go.

11      MR. SHEASBY:  There are approximately a hundred

12  claims   I think there's two points to emphasize.  One has to

13  do with our obligations under the Federal Rules and the Patent

14  Local Rules of this Court.  It is our understanding that we

15  have to identify all of the claims that we have a reasonable

16  basis for believing that CIBA infringes.  Now, certainly there

17  is no way that a hundred claims are going to be presented to a

18  jury   And just as in, I think, all patent cases, as discovery

19  progresses and as claim construction proceeds, the claims are

20  going to narrow; and ultimately the parties are going to

21  identify a representative set of claims which to present to a

22  jury.

23      I think the other point to emphasize is that

24  there's a couple unique features about these patents.  They

25  were prosecuted by the same attorney; and although there are a

 1 | hundred claims at issue, there are actually a relatively
 2 | limited number of independent claims.

 3 | THE COURT:  Well, I mean -- and I guess that gets
 4 | into -- I mean, tell me if I'm wrong.  I mean, you've got a
 5 | hundred some-odd claims and supposedly this was done after a
 6 | reasonable Rule 11 investigation and you are able to get copies
 7 | or samples of their contacts.  So, in effect, if you are
 8 | correct that they are infringing on all these hundred claims,
 9 | you are saying basically they're making the exact same contact
10 | lens with almost the exact same process in almost every
11 | respect.

12 | Now, if that's true, then you ought to be able to
13 | prove that their violation of -- or infringement on ten of the
14 | claims proves your case and entitles you to your entire set of
15 | damages.  And if it's false, if they can prove, you know -- I
16 | mean, it's almost like the -- and I'm following along on some
17 | of Judge Folsom's logic where if there's really that many
18 | claims being infringed, you are in effect saying to the Court
19 | this is an open-and-shut case, they are just total infringers,
20 | just basically copycats.  And if that's true, you ought to be
21 | able to prove it pretty easy.

22 | And, so, I am not uncomfortable with the idea; and
23 | you're talking about limiting it down.  I guess the question
24 | becomes when; and in my mind it's got to be before the *Markman*
25 | because, otherwise, I'm attempting to construe terms for a

7

 1 hundred different claims, which becomes an almost impossible
 2 intellectual exercise.

 3              MR. SHEASBY:   I understand your concern,
 4 your Honor.   There's -- a point to remember about the claims is
 5 that there are a number of claims at issue.   They actually
 6 coalesce into a number of core concepts.   And I think if you
 7 look at the claims -- this is a sampling of the independent
 8 claims from the toric patents, the five toric patents.   And you
 9 will see that each of those independent claims -- and I think
10 there's 13 of them -- really center around the same core
11 concepts:   an optic zone, an inner zone surrounding an optic
12 zone, a ballast portion, a substantially uniform horizontal
13 thickness.   And if you take a look at the claims themselves --
14 these are excerpted versions of two of the claims, one from the
15 new toric patent and one from the original toric patent -- you
16 will see that there are reoccurring core limitations.

17              And, so, though in a normal situation there might
18 be a correlation between limiting claims in advance of claim
19 construction and limiting the number of terms you are going to
20 have to construe, in this situation I'm actually not sure
21 that's the case because of the way the claims are structured
22 with a distinct independent claim and then a number of
23 dependent claims tailing off of the independent claims.   But
24 the dependent claims themselves actually repeat.   And, so, as
25 one example just going on and focusing on the toric patents, I

1  think there are 67 independent -- 67 dependent claims in the

2  toric patents; but about 47 of them really coalesce into these

3  five categories and, with those five categories, the same

4  repeating limitation over and over again in dependent claims.

5          The point I'm trying to make, your Honor, is, if

6  you were to, say, cut the claims by a third, there wouldn't be

7  a correlation between the number of claim terms in dispute

8  being limited by one-third because in those claims that are

9  being -- the claims that still remain, the same terms are going

10  to just -- are going to be present.

11          THE COURT:  But there is -- I think you're making

12  my argument.  You're saying these are all very similar.  If

13  they are infringing one, they are infringing the others.  It

14  isn't necessarily always true; but it seems to me that having

15  done your investigation or having a chance to do a little bit

16  more investigation, you ought to be able to pick the ten or so

17  that:  Yeah, they are infringing.  We really think these are

18  infringements.  We're not even going to waste time with the

19  lesser infringing ones.  We're going to nail them on this.

20          And present those to me, and the advantage is --

21  is, it saves the time of arguing over is there a difference in

22  this term here or there or are we talking -- I mean, it makes

23  the writing of the Order, for one thing, quite a bit easier

24  because you are focusing on these definitions in respect to

25  certain terms and then just saying, you know, the same thing

1   applies to the others rather than having to take up slight

2   possible nuances in all of the others.

3            I mean, you -- it seems to me what you've said here

4   actually supports my concern; and that is, these are very, very

5   similar.  And, therefore, it doesn't seem to be a great burden

6   to have very skilled counsel, such as yourselves, to get right

7   down to, you know, tell me what the evil thing is these people

8   are doing.  I mean, if they are stealing your stuff, point it

9   out.  Let's not waste time with the little stuff they are

10  stealing.  Let's go right to the heart of it and show -- I

11  mean, I'm putting it in terms of criminal law, obviously;

12  but -- it's partly to make sure that the claim construction

13  goes through; but in the end we're also looking forward to the

14  jury trial where attempting to present too much information

15  actually winds up, I think, working to Defendant's benefit.

16            MR. SHEASBY:  I understand your concern,

17  your Honor.  Like I emphasized, this was not done in an attempt

18  to sandbag CIBA or to be overly aggressive.  We did this

19  because we felt it was our obligation to identify the claims.

20            One of the things that is important to emphasize is

21  that even though the claims have core similarities, that there

22  are differences between them   And though those differences may

23  not matter for infringement, those differences may matter for

24  validity.  And we haven't received CIBA's invalidity

25  contentions, and we anticipate that --

1              THE COURT:  Well, I think those are due

2  January 5th, aren't they, on the first set of patents?

3              MR. SHEASBY:  That's correct, your Honor.  And I

4  think once the invalidity contentions come in, once the parties

5  have identified by mid-January the terms that they believe have

6  to be construed in the patents, I think two things will occur.

7  One, I think there will be a natural ability to limit the

8  number of terms in dispute; and I also think that the parties

9  will better understand and better be able to identify

10  representative claims.

11             It seems to me that if what I'm saying is true,

12  that even though there are a hundred claims at issue, that it

13  really coalesces into a limited number of terms, that it is

14  something that the winnowing of the claims, the identification

15  of representative claims, is something that doesn't have to be,

16  shall I say, forced in the way Judge Folsom does it.  I don't

17  mean that in a pejorative sense.  I mean limiting claims via a

18  Court Order as opposed to what occurs in many patent cases,

19  which is to say reasonable people do reasonable things.

20  Reasonable people don't present 20 or 30 limitations to a Judge

21  to construe in a day hearing; and reasonable people don't

22  present, you know, 30 claims to a jury for a patent

23  infringement case.

24              THE COURT:  Well, actually this might be best

25  addressed to the Defendants.  As I understand it, you received

1 the infringement contentions on the old case, the 149 case, in

2 a timely manner.  Now I'm talking to Defendants.  And then the

3 Plaintiffs went ahead and served their infringement contentions

4 on the new case even, you know, prior to the management

5 schedule  So, you have all of that information.

6    You know, typically I wind up having a *Markman*

7 conference anywhere between five and seven months in any case.

8 If I go ahead and issue an Order now in terms of tentatively

9 setting this *Markman* -- or initially planning to have it all on

10 the same *Markman* date -- and I may set an interim date after

11 some initial discovery of cutting down the number of claims.

12 Tell me what prejudicial disadvantage -- unfairly prejudicial

13 disadvantage that works to you.  And, again keeping in mind

14 that if this was a brand-new case and we hadn't had the first

15 one at all, we would be looking at five to seven months out

16 anyway.

17    MR. MEDLOCK:  Bryan Medlock, your Honor, for CIBA

18 Vision.

19    This discussion we're having now is, in truth, déjà

20 vu, as you observed early.  In the case management conference

21 we had in October, I pointed out to the Court that there were

22 130 claims then in issue and that there was no way that the

23 parties could practically handle that many claims by way of

24 infringement contentions and invalidity positions.

25    We were told by this same counsel for CooperVision

1  that -- as we were told again today -- the reasonable person is

2  going to whittle down the number of claims before we get to

3  trial; so, it should not be a problem.

4              On October 10, when that statement was made, the

5  applications for the two patents in the new case had already

6  been allowed.  The issue fee had been paid for weeks in advance

7  of that hearing   And the patents issued a few weeks, I think

8  less than about a month, after we had that hearing.  So, while

9  we were being told that the case would be whittled down by

10  reasonable people in October, the counsel for CooperVision knew

11  that they were about to issue two new patents from which they

12  have asserted something like 18 new claims at the very moment,

13  without telling us that they were about to add two new patents

14  to this conflict.  When they produced documents later after

15  that Case Management Conference, they didn't give us copies of

16  those applications for patent which had been allowed, issue fee

17  paid, and were about to issue.  We didn't learn about those

18  patents until we were sued.

19              Now they sit here and say, "Oh, well, now we want

20  to condense this already tight schedule that the Eastern

21  District sets for these cases to add some patents which we

22  never told you about when we had our initial Case Management

23  Conference but which had already been paid on the issue fee;

24  and, by the way, you can't withdraw them from issue without

25  petitioning the Commissioner of Patents for permission to do

1  so."

2         So, there is no surprise here on CooperVision's

3  part that they are putting us in a time crunch because they

4  knew that when we had the initial conference.  This should have

5  been brought up in October, your Honor.

6         THE COURT:  Okay.  Just so, I guess -- and since

7  all counsel appear before me regularly.  I don't memorize all

8  of the papers that come in to me, but I do read your motions

9  and replies.  And when we get here -- and I've made lots of

10  jury arguments.  I've tried lots of cases.  I understand the

11  emotional part of -- but in most cases -- I mean, I'm not a

12  jury  It doesn't serve anybody very well to try to get me mad

13  at somebody.  If I'm mad at somebody, I'm already mad at them

14  for what they have done or not done.  I know what they have

15  done or not done.  Been there, done that.  I lived through the

16  Rambo years.  You were a younger lawyer in those days, in the

17  Eighties.  I mean, I don't know every trick in the book; but

18  I've seen a lot of them.  But now I'm the Judge and I've got to

19  look at:  I've got very similar patents; I've got a limited

20  schedule.

21         It's pretty obviously I'm thinking in terms of,

22  okay, these patents are very closely related.  We need to get

23  down to a much smaller representative number of claims that can

24  be dealt with at *Markman* and then at trial.  And in some ways I

25  think that actually helps Plaintiff  But you might be arguing:

1  No, no, we want lots and lots of them to confuse the jury.  I

2  mean, that would be a potential tactic, I suppose, that a

3  Defendant could take.

4          But what I want right now is -- you know, assuming

5  I set a deadline within -- well, right now the *Markman* on the

6  first case is set for -- the claim construction is set for

7  June 27th.  Considering that claim construction could actually

8  be done at any time -- it is just a definition by the Court of

9  terms which, as I understand it, used to be done and could

10  still be done on the day of the jury trial.  It makes it very

11  hard for all of the experts, obviously, which is why we try to

12  do it earlier.

13          What unfair prejudice -- not prejudice -- because,

14  as Judge Justice pointed out to me once, that's my opponent's

15  job, is to prejudice me in my job; it is unfair prejudice --

16  would there be in tentatively saying, okay, the *Markman* Hearing

17  is going to be on this date and then let's figure out how we're

18  going to condense this down so that the *Markman* is realistic.

19          I mean, there is also the practical matter of:  We

20  go through this one case and try it and they find out all their

21  mistakes as you brilliantly defend and then they come back with

22  this second set of patents with a complete new trial.  I mean,

23  I don't really want to give Plaintiff two bites at the same

24  apple which, given the closeness of these kind of patents,

25  seems to be a possibility.  I don't think I can issue an Order

1  saying that if you lose the first case, you lose the second one

2  automatically.  And, so, I'm actually looking for a way to get

3  this done reasonably and only get -- you know, basically they

4  get one chance to bite you, one trial; and that's it.

5         Now, I think good counsel can think of six

6  different ways and eight different arguments against what I

7  just said; but this is what I'm thinking of.  So, tell me what

8  would be unfairly prejudicial about saying, okay, we're going

9  to move forward -- and in light of the fact that I frequently

10  set a *Markman* within five or six months.  I mean, if this was a

11  brand-new case, nothing prior, you might be -- and especially

12  with only an 18-claim and 2 patents, might say, okay, we're

13  going to go to *Markman* in five months.  I mean, a lot of

14  information has been disclosed.  Tell me what particular

15  problems you run into then

16         MR. MEDLOCK:  Several.

17         THE COURT:  Okay.

18         MR. MEDLOCK:  First, as you will hear when we get

19  to the disputed issues with respect to discovery, we still do

20  not have any specificity with respect to why we are said to

21  infringe the original set of toric patents.  And we'll show you

22  drawings from the patent and the answers we got and the

23  infringement contentions to demonstrate we don't know why they

24  are charging our lenses with infringement because they won't

25  identify where in our lenses you find some of these terms that

1 have been shown to you today on the screen.  They refuse to do
2 it.

3         And we want you to -- I'm getting over into
4 discovery disputes, but it has to do with our prejudice because
5 only when we know how they intend to apply the claims to our
6 lenses can we really give you meaningful invalidity
7 contentions.  That's been a problem for us, is coming up with
8 our invalidity contentions in view of the lack of specificity
9 of how they claim we infringe.  We're still going to come
10 forward on January 5 with a set of invalidity contentions; and
11 we're asking the Court to permit us -- once you have ordered
12 them, as I think you will, to give us specific information on
13 where in our lenses you find these different zones -- to
14 supplement our invalidity contentions with art that we can then
15 find that has to do with those features.  That's the first
16 prejudice.  To have an early hearing on these claim terms
17 before we even know how they apply them to our product is
18 prejudicial.

19         Number 2.  Until we know how they are going to
20 construe these claim terms, that is, how they are going to
21 apply them to our product, it's difficult for us to know what
22 claims we are going to ask to be construed.  In the two new
23 patents, they have changed the terms.  I don't know whether you
24 caught it.  But when they were putting the original claim
25 language and the new claim language of the toric patents on the

1  screen, they said they were basically the same.  The language

2  is different.  The terms are different in many respects.  In

3  fact, there are 16 different terms in the new toric patents in

4  the Lufkin case, the new case, that aren't in the old toric

5  patents.  They are gonna have to be construed unless they take

6  the position -- and we don't think they will -- that they mean

7  the same thing, these new terms, as some of the old terms.  I

8  don't think they will take that position because they added the

9  new terms to avoid problems that the old terms created for them

10 in trying to apply them to our products.  So, there is

11 prejudice to us to bring in new patents with new terms without

12 us having any specificity as to how those terms could be

13 applied to our products.

14          Now, according to your preliminary schedule in the

15 new case, there would be a *Markman* Hearing on October 3 if you

16 count days from the case management --

17          THE COURT:  Well, that would be one -- that was

18 based on the only day I had available was in October.  We've

19 had so many patent cases come in in one big bunch that October

20 was the date available.  But what I don't want to do is go

21 through a claim construction at the end of June on the first

22 bunch of patents and then in October basically rehash the same

23 thing.

24          MR. MEDLOCK:  I agree.

25          THE COURT:  I mean, that's a waste of everybody's

1    time.  And, yeah, there could be, you know, a few tiny minor

2    differences; but that would be, to me, a huge waste of time and

3    an incredible expense to both sides.  So, that's where that

4    October date came from, was just that was the next time I had

5    open on my docket for a *Markman* given all the other *Markman*s

6    and trials that I have on the schedule.  It had nothing -- that

7    was just why it's that particular day.

8              MR. MEDLOCK:  CIBA agrees with you that the cases

9    ought to be consolidated; and on December 18 I wrote counsel

10   for CooperVision suggesting that if they wanted to meet and

11   confer with respect to consolidation and consideration of a

12   changed schedule, we were available to meet.  They have

13   declined to talk to me about a revised schedule.  So, here we

14   are without having conferred with each other about what might

15   be a reasonable date for a *Markman* Hearing with respect to all

16   of these patents; and, so, it is left up to the Court to decide

17   what can be done.

18              I personally favor your suggestion that we have a

19   hearing and a trial on the spherical lenses first.  There are

20   two of those patents that have to do with the spherical lens.

21   The toric patents are different.  Have a later trial on the

22   toric patents; and it would be less confusing, I suggest, to

23   the jury than having one trial dealing with two different

24   classes or types of inventions.  That's a good suggestion, I

25   think; and we could proceed as presently scheduled in the first

1 case with some rapidity if we have limited the case to those

2 two spherical patents.  Then take up, in a separate proceeding,

3 separate claim construction, the toric patents and a separate

4 trial date for the toric patents.  That makes eminent sense.

5 What I have seen done in other cases where you had

6 many -- in fact, in one case there were five patents being

7 asserted by the Plaintiff.  We were involved on the Plaintiff's

8 side.  Judge Ron Whyte out in San Jose, United States District

9 Court there, limited, as I remember, the case to 20 claims out

10 of five patents and then, come trial time, made the parties

11 reduce it to 10 so that the jury was only asked to pass on the

12 infringement and validity of 10 claims out of -- I think there

13 were several hundred claims in those patents, as I remember.  I

14 could get specific numbers for the Court.  But that made the

15 case manageable.

16 THE COURT:  Well, and that's exactly what I was

17 talking about.  Judge Folsom has done something similar.

18 That's exactly what I'm looking at, is --

19 MR. MEDLOCK:  And if you would do that, your Honor,

20 I think we could pick a claim construction date that met with

21 your schedule as early as you want it, if we can limit it to a

22 few claims.  But as we're now faced with over a hundred claims

23 we have to deal with and all the terms that have to be

24 construed, it is a major, major task.

25 And I know I've heard you speak in the past at

1  seminars that you want the parties to limit the number of terms

2  to those that are case-determinative, that really matter.  And

3  it is hard here for us to know what those are without knowing

4  how they are applying them to our products.  So, we need two

5  things.  I think we need to limit the number of claims and get

6  an Order from you telling them to be specific with respect to

7  our products, how those claims apply.  Not conclusory, yes,

8  it's there, where is it and how do you know it is there.  Be

9  specific.

10        I hope I've responded to the prejudice.

11        THE COURT:  All right.  What I'm -- I've got a

12  different draft of the Scheduling Order in this particular

13  case, and I'm going to basically take it -- or run it as though

14  the Rule 16 initial management conference was today.  And

15  basically what this is going to wind up requiring is that --

16        And actually I may give the Plaintiffs a choice on

17  this.  I mean, we can continue through the whole thing; but

18  what I'm going to suggest is that by March 7th the Plaintiffs

19  come down and identify 20 claims that allegedly infringe that

20  will go forward for the *Markman* claim construction which we'll

21  plan on holding at the same date on all of the cases, the new

22  ones and the old ones -- or both cases, all of the patents, the

23  new ones and the old ones, on June 27th as set out before.

24        Now, that's obviously going to require some work on

25  the part of Plaintiffs; but you allege that you have already

1   given your infringement contentions, in fact, quite a bit

2   early.  And I'll also note that on the Defendant's side, as far

3   as invalidity contentions, in that second group of patents,

4   they've got a list of prior references in one of those patents

5   that is about the longest I've ever seen.  Not that I read

6   those on a daily basis; but there is a huge amount of prior art

7   reference that they talk about there, which should help in

8   terms of where it is they are coming from

9           Now, when we get to that point and when we get to

10  the *Markman*, right now I'm planning on having just the one

11  trial; but it may be that we're going to have to divide up the

12  trials into edge design and toric cases.  And I'll hear from

13  the parties at that time about that, but right now I'm planning

14  on going forward.

15          Now, as far as the discovery, I have, because of

16  the long holiday, just received the various motions -- or the

17  motion, I think, that Defendants had filed or Plaintiffs had

18  filed.  There are some discovery motions already that have been

19  coming in.  I would caution both sides in terms of -- and this

20  is partly what Mr. Medlock said.  You outlined the precise

21  tension that occurs in every case.  Obviously, Defendants want

22  total and complete disclosure from Plaintiffs so that they know

23  exactly where to set all of the traps; and Plaintiffs want

24  Defendant to disclose everything so they know exactly what to

25  put -- I mean, this is set out in various literature and books;

1 and I even put it out in one of my Orders. It is the football

2 field as a minefield analogy. And, sure, both sides want

3 everything from both sides -- or from the other side; but there

4 is no way to run a fair system like that.

5       The Plaintiffs are wanting things to move forward

6 quickly. I would sure encourage you to make sure that your

7 infringement contentions are as direct and precise as possible.

8 The Defendants are going to want to -- or may want to rely on

9 invalidity contentions.

10       And given the lead time because of the delay that

11 occurred while this case was in Marshall, it is a little

12 difficult for Defendants to be in the position of some

13 Defendants: We just got sued; we had no idea what we've had to

14 research. This case has been on file a long, long, long time.

15 And the idea that Defendant's attorneys and engineers haven't

16 been at least casually looking through the research, getting

17 ready to defeat this in terms of showing that their patents are

18 invalid doesn't ring as very likely. The case was filed -- or

19 was sitting around the court in Marshall for a number of months

20 before it came to me and then -- in fact, as I recall, the case

21 was filed April 10th, 2006   There was an agreed motion to

22 delay the answer. Finally there was an answer on June 5th of

23 2006. The case was finally transferred to me on June 14th.

24       Well, the idea that CIBA was sitting around doing

25 nothing during all that time -- sure, you didn't have all the

1 exact information; but in terms of invalidity, there was some
2 time there. It's not -- the surprise argument isn't quite as
3 strong as it might be in other cases when there has been less
4 time. I'm not saying that -- I'm not even allowing
5 CooperVision to reset the schedule by preemptively filing its
6 notice of infringement and its infringement contentions and,
7 therefore, setting the schedule on that. I'm going as though
8 today was the management conference, recognizing there has been
9 some extra time there. If it was wasted by CIBA, well, then
10 they wasted it. But, again, I don't see that the claims of
11 surprise are quite as strong as they might have been.

12 If there are particular complaints you have about
13 the infringement contentions not being specific enough, rather
14 than saying none of them are specific enough, I suggest you
15 make sure that counsel knows exactly what those are because I'm
16 not really interested in doing discovery myself, I mean,
17 sitting down and saying, "All right. Now what do you say?
18 What do you say? What do you say? What do you say?"

19 That doesn't make any sense. You are all very
20 competent counsel; and if there are real honest and true
21 questions that you don't have answered or that you are entitled
22 to, that's one thing. In terms of going far beyond that -- and
23 I've heard some of the replies, and both sides seem to be
24 pointing the finger at each other. It is just the natural
25 tension of this kind of -- involved in this kind of case in

1 terms of -- even more than we used to have in other kinds of

2 products liability litigation and personal injury litigation.

3 Both sides want the other to go first; and, in effect, both

4 sides are going to kind of have to mutually disclose.

5         Mr. Medlock.

6         MR. MEDLOCK:  First, I would like to address the

7 issue of the invalidity contentions.  The new patents have

8 claims of different scope than the old toric patents.  As a

9 result of that, the searching we have done in the past -- and I

10 hope we haven't wasted any time in doing that searching --

11 doesn't apply necessarily to the scope of the new toric patent

12 claims which have new terms and new scope.  We'll be happy to

13 go into the detail of that if you wish.

14         We have commissioned, as soon as we learned about

15 the new patents and the new scope, prior art searching.  That

16 searching won't be done for 25 days.  So, I can't make final or

17 semi-final invalidity contentions with respect to the new

18 patent claims -- and I am going to comply with the January 5

19 deadline as you've ordered with respect to the old patents --

20 until I have that prior art.

21         THE COURT:  Well, that should work out pretty well

22 because under the schedule, like I said, taking it as though

23 today were the management conference, that wouldn't be due

24 until February 21st.  So, that gives you your 25 days plus most

25 of the way through February to work on that.  I mean, that --

1  I'm not going to try to hold you in the new case to the

2  schedule of the old case other than the Claim Construction

3  Hearing.  In other words, I've worked out a schedule as though

4  here is the management conference.  They have gone ahead and

5  done their infringement contentions and -- you know,

6  recognizing that you've had some time but part of that time was

7  also with the Christmas and New Years vacation period and no

8  one -- less work gets done then than at other times of the

9  year.  But just so you know, I mean, invalidity contentions

10 wouldn't be due until February 21st in that case.

11            MR. MEDLOCK:  In that case.

12            THE COURT:  In that case.

13            And on the other one, the January 5th, there has

14 been since -- well, to some degree since April of 2006 to start

15 looking at -- since that was when the suit was first filed.

16 Obviously, you haven't had their precise infringement

17 contentions all that time; but it's also, I think, a little

18 disingenuous to say, "Well, we just sat on our hands and did

19 nothing," when you know what they are coming after you with.

20            MR. MEDLOCK:  No.  We didn't sit on our hands and

21 do nothing.

22            THE COURT:  No, I didn't think you did.

23            MR. MEDLOCK:  No.

24            THE COURT:  I mean, that's --

25            MR. MEDLOCK:  And we can't give final invalidity

1  contentions until we know how they interpret -- I'm not asking

2  for claim construction.  How do they apply the claims to our

3  product?

4          And I'd like to -- you have taken the view that

5  maybe it's one of these he-said, she-said, who knows what

6  really happened and go forward with this case.  We would like

7  to address in just a few minutes why we contend that their

8  infringement contentions aren't specific.  They aren't at all,

9  and they don't help us at all decide how the claims apply.  I'd

10  like to show you a drawing from the patent.

11          THE COURT:  All right.

12          MR. MEDLOCK:  Okay.  I'm going to ask Mr. Hatcher

13  to do that, your Honor -- he's been involved in this discovery

14  dispute -- to show you that we really haven't received the kind

15  of information we need as a preliminary matter.

16          MR. HATCHER:  Good afternoon, your Honor.  Mike

17  Hatcher for the Defendants.

18          Your Honor --

19          THE COURT:  You are not in some way related to the

20  Mike Hatcher of Tyler, the appellate lawyer, are you?

21          MR. HATCHER:  No, your Honor.

22          THE COURT:  Okay.

23          MR. HATCHER:  There is a fair number of Hatchers

24  out there, but I don't believe I'm related to that one.

25          THE COURT:  Oh, I don't think that would be a

1  disgrace.  He was -- at least he used to be a really good

2  appellate lawyer.

3  MR. HATCHER:  Oh, no, no.  I didn't mean it that

4  way at all, your Honor.

5  Do you have before you the letter that we filed on

6  December 29th and I think we hand-delivered to your chambers?

7  THE COURT:  No.

8  MR. HATCHER:  All right.  I was just going to

9  direct you to this drawing --

10  THE COURT:  All right.

11  MR. HATCHER:  -- which is included in there.  And

12  if you look on this drawing, this is figure 1 of their toric

13  patents.  I believe it is figure 1 in all their of the patents

14  in the original case.  And, your Honor --

15  THE COURT:  Which is the -- I've got it up here on

16  the screen; but when you say the -- which -- let's see, the

17  toric patents, the '740, the '903 and the '746?

18  MR. HATCHER:  Yes.  I believe this one is from

19  the -- this one is from the '903 patent.  So, it is figure 1

20  from the '903 patent.

21  THE COURT:  Okay.

22  MR. HATCHER:  And when we talk about their

23  infringement contentions being deficient, what I'm specifically

24  talking about -- or what we are specifically talking about is

25  that if you look on this drawing, when they talk about a

*1-3-2007 Scheduling Conference*

28

1  substantially uniform horizontal thickness being a claim

2  limitation, it is not a substantially uniform horizontal

3  thickness just anywhere and it is not just one line of

4  substantially uniform horizontal thickness that we believe they

5  are going to assert their claims cover.  It calls for a band --

6  their claims call for a band of uniform horizontal thickness;

7  and they call for it in specific points on the lens, the

8  accused contact lenses, depending on which claim you are

9  talking about.

10          And the way that you determine the size of that

11  band requires that you know where -- and if you will look at

12  figure 1, your Honor.  It requires you to know where the

13  boundary line is between the peripheral zone and the inner zone

14  so that you know where the peripheral zone is on the accused

15  lens and where the inner zone is on the accused lens.  You have

16  to know where that boundary is in order to do the calculations

17  that are in their claim limitations to determine both where

18  this alleged band of uniform horizontal thickness is and how

19  big the band is.

20          And when I say "how big the band is," what I mean

21  is, if you look at the -- if you look at their figure 1, you

22  will see what we'll call -- you'll see a line going down the

23  horizontal that's labeled "BZ."  We'll call that the vertical

24  meridian.  Their claim limitations require that the substantial

25  uniform horizontal thickness exists for a certain portion of

1   that vertical meridian.  And the way that you determine the

2   size of that portion is with reference to the boundary between

3   the peripheral zone and the inner zone.  And they simply

4   haven't, in their infringement contentions, told us where they

5   allege that boundary is on our lens.  And without knowing where

6   that boundary is on the lens, there is no way to determine

7   whether or not our lenses actually infringe.

8           It is a key part of their infringement contentions

9   that they haven't given us; and it causes us real problems

10  because without knowing that, we can't tell how they are

11  applying their claims to our product, which is problematic to

12  our invalidity contentions because without knowing how they are

13  applying the claims to our product, it makes it very difficult

14  for us to look at prior art public sales of other contact

15  lenses that are on the market and figure out what prior art

16  public use lenses -- and I'm putting aside patents and

17  publications where we can read the disclosure.  I'm talking

18  about having to look at a physical device that was on the

19  market before the critical date of these patents and determine

20  whether or not we want to chart that for our invalidity

21  contentions.

22          We need to know how they are interpreting and how

23  they are going to place this peripheral -- this boundary

24  between the peripheral zone and the inner zone on our contact

25  lenses to give us some sense of what we should allege, what

1 prior public sales or public uses we should allege invalidate

2 the patents   And that's really our point, your Honor, about

3 the deficiencies in their infringement contentions and how they

4 affect our ability to give meaningful invalidity contentions

5          THE COURT:  Well, on the other hand, that argument,

6 I suppose, could be raised in every case; and that is -- and

7 actually it is what Defendants always want.  You would like to

8 have their complete claim construction position and the

9 definitions from the Court defining all of the claims before

10 you give your invalidity contentions.  That would be ideal for

11 any Defendant.

12          And ever since the Northern District of California

13 came out with their rules setting out a schedule recognizing,

14 as I mentioned before the tension, that hasn't been allowed.

15 So, yes, I understand that it makes it a little hard because

16 you are taking a look at the claims; but I don't know of any

17 courts that have adopted the California, slash, Eastern

18 District of Texas, slash, several other District Courts set of

19 so-called Patent Rules that are requiring Plaintiffs to, in

20 effect, set out their claim constructions before the Defendant

21 then says, "Oh, now that you've done that, we know where we're

22 going to get you on invalidity."

23          MR. HATCHER:  Right, your Honor.

24          THE COURT:  So, that -- I mean, I understand why

25 you want it; and I understand that most Defendants do want

1 that    But that is part of the decision that has been made in
2 the cases to say, "No, that's not how we're going to do it."
3         Now, there is always the possibility that after
4 claim construction, if the claim construction itself shows that
5 a piece of prior use, prior sale type art is clearly
6 applicable, that that may wind up being added.  On the other
7 hand, you run the risk, of course, of it being clearly
8 available before and the Court finding out that, no, this is
9 obviously just a "gotcha" that you're saving.  So, that's the
10 kind of tactical decision you make all of the time.

11         But I don't think, you know, that prevents you from
12 putting out your invalidity contentions.  And I guess the other
13 thing that the Court has to note as a practical matter is that
14 with most juries, you are either going to have that piece of
15 prior art that says exactly what -- or was exactly what the
16 other one was for invalidity, or you are going to have maybe a
17 couple of them that go together with obviousness.  But if you
18 try to flood the jury with lots and lots and lots of stuff,
19 your expert is going to look like he's just blowing smoke; and
20 it is not going to come up well.

21         Now, I also recognize that no defense attorney
22 wants to turn down or limit themselves in any way, shape, or
23 form because they have got a client sitting there saying,
24 "Well, why didn't you make argument Z?  You only made arguments
25 A, B, and C."  I understand that, but that's just part of the

32

1 system we're in.

2         So, if there are specific questions that you have

3 of Plaintiff, I would suggest that you ask them specifically.

4 But part of this is going to come out in your discovery.  I

5 mean, you are going to have to wind up talking to or deposing

6 their people, which is how you are going to find this out   I

7 mean, my guess is to some extent, their attorneys don't even

8 know the answers to your questions.  It is going to have to be

9 in your deposing their experts, and you have discovery time to

10 do that

11         MR. HATCHER:  May I make a couple points,

12 your Honor?

13         THE COURT:  Sure.

14         MR. HATCHER:  First of all, we're not asking and we

15 don't want a definition of any of the terms that they have in

16 their claims.  All we want is for them to apply their claims to

17 our products.  And I think that's what the infringement

18 contentions are.  They just have to apply their claims to our

19 product and show us how they believe our product infringes.

20 And without marking -- without showing us where on our lenses

21 they believe this boundary between the peripheral zone and the

22 inner zone is and, thus, creating the peripheral zone and the

23 inner zone, there is no way to, in good faith, determine

24 whether or not our lenses infringe because you have to do that

25 before you can make an infringement determination for any of

1 | their claim limitations.

2 |      All we want is an application of their claims to

3 | our product and specifically for them to show us where they

4 | contend the boundary is between the peripheral zone and the

5 | inner zone.  And they, I believe, have declined to do that; and

6 | they have explicitly said they haven't given us that

7 | information in their responsive letter and are not intending to

8 | give it to us.

9 |      THE COURT:  All right.  Let me hear from

10 | Plaintiffs.  The question sounds fairly simple.  Where is this

11 | inner zone boundary, outer zone boundary, peripheral zone?

12 | What's so difficult about answering that question?

13 |      MR. SHEASBY:  Your Honor, do you have handy the

14 | claim charts for the patents-in-suit?  I have a color copy if

15 | that would assist the Court.

16 |      THE COURT:  Okay.  This is attached to what?  Your

17 | initial infringement contentions or this supplement that you

18 | filed?

19 |      MR. SHEASBY:  This was with the supplement that I

20 | filed, but I have it in a very easy form if I may approach.

21 |      THE COURT:  All right.

22 |      MR. SHEASBY:  Your Honor, if you look at tab -- I'm

23 | just randomly putting up tab 3 right now, and I am on page 2 of

24 | tab 3.

25 |      THE COURT:  I assume that defense counsel has a

1  copy of this.

2           MR. HATCHER:  Yes, your Honor.

3           THE COURT:  Okay

4           MR. HATCHER:  Well, I have one in front of me.

5           MR. SHEASBY:  Your Honor, what we've done is, up

6  until December 26th, the only real information we had available

7  was the images we took of CIBA's lenses and analysis we did of

8  those lenses.  And what we tried to do is, based on the data we

9  have available, sketch out the zones of the lens.

10          And, so, if you see on page 2 of the chart in A.3,

11  we've done that on an image of a CIBA $O_2$OPTIX lens.  We have

12  identified the peripheral zone, the inner region, the optic

13  zone.  If you would turn the page, one of the things that CIBA

14  points out in their letter to the Court is that they don't know

15  over what region of the lens there is a substantially uniform

16  horizontal thickness.  What we've done for that -- at least

17  what we've tried to do is, we've taken horizontal sections from

18  three representative portions of the lens; and we presented

19  those on page 3 through 6.  And we identify the portions of the

20  lens that they are from; and we point out to the fact that

21  exclusive of the optical zone and the peripheral zone of the

22  lens, that there is a uniform thickness on this lens that

23  doesn't vary by more than 30 micrometers or 20 percent.

24          Now, there is no doubt -- and I'm sorry.  I don't

25  want to get ahead of the Court, so...

1           THE COURT:  No   I've looked at it.

2           MR. SHEASBY:  There is no doubt that as this case

3  progresses, more information will be available.  On

4  December 26th, CIBA identified the documents that support their

5  noninfringement contentions.  There were over 3,000 documents

6  identified.  A number of those documents are not accessible to

7  us at this time.  We're working with CIBA, and we requested

8  that CIBA give us the information necessary to access those

9  documents.  And I think as this case progresses, we'll be able

10  to provide more detail.  Right now this is the detail we are

11  able to provide based on the information we've had.

12           I think it is very telling that one of the things

13  that Mr  Hatcher said in his oral argument was, he said, "We

14  need to know how they interpret the peripheral zone."  Well, I

15  submit to you, your Honor, that the information that they are

16  seeking is really a definition of "peripheral zone."  It is a

17  definition of the "inner zone."  Now, that's coming very

18  quickly, your Honor.  The claim construction process is

19  starting at the middle of this month.  The preliminary

20  disclosures of claim construction positions, I believe, is

21  occurring in February.  And obviously at that time, we're going

22  to be able to give them more information about our positions;

23  and we hope that they will be able to give us more information

24  about their positions.

25           One of the things that -- I've been recently in

*1-3-2007 Scheduling Conference*

36

1   front of a Judge in Delaware in the United States District

2   Court in Delaware.  He's been elevated to the Third Circuit

3   now.  But one of the things he told me --

4              THE COURT:  Has he made it yet or just nominated?

5              MR. SHEASBY:  He was just elevated.

6              THE COURT:  Really?  They went through and gave him

7   his hearing?

8              MR. SHEASBY:  Yes, yes.  He has been elevated.

9              THE COURT:  Good for him.  He's a friend of mine is

10  why I mentioned, Kent Jordan.

11             MR. SHEASBY:  Oh, really?

12             THE COURT:  Yes.  I know him fairly well.

13             MR. SHEASBY:  One of the things that he pointed out

14  to me is that discovery is a two-way street, and you have to

15  give to get.  And I think that if you compare the infringement

16  contentions that we presented with the noninfringement

17  contentions that CIBA presented, it is -- I think the balance

18  weighs towards CooperVision, that CIBA has gone ahead and they

19  have identified limitations that they believe they don't meet;

20  and that's all they have done.

21             And we hope that as time progresses -- they say

22  they need our claim construction positions to more fully

23  analyze their noninfringement points; and we hope that when we

24  give them those claim construction positions, they are going to

25  be able to do that for us.

1          But I would say that the level of detail we have

2   given them where we have identified exactly where the

3   horizontal thickness is -- if you look at claim 13 -- if you

4   look at page 13 of the claim chart --

5          THE COURT:  All right.  Which exhibit is this now?

6          MR. SHEASBY:  This is the same exhibit, A.3, at

7   page 13

8          THE COURT:  All right.

9          MR. SHEASBY:  And you will see at claim 12 we

10  actually identify that the ballast portion is across the entire

11  inner zone of the lens.  And, so, it is the entire ballast

12  portion across the entire inner zone that has a uniform

13  horizontal thickness exclusive of the optic zone and the

14  peripheral zone.

15          Once again, this is information based on micrograph

16  images of the lenses.  We're going to crunch the data on their

17  design files that they have given us, and we hope that -- we

18  know that over time, both parties will have more detailed

19  responses.

20          I think, your Honor, there are two other things

21  that I think it is worth pointing out.  One of the things is

22  that we always refer to this April date as the date on which

23  CIBA became aware of these patents; and the factual record will

24  show that that is not the case, that CIBA was aware of these

25  patents before they were asserted against them.

1         And I think the second point to emphasize is that

2 these patents that were -- these patent applications were

3 publicly available for many, many, many months.  And we hoped

4 and we assumed that CIBA would have looked at them; and if they

5 haven't, then we certainly think that the time that the Court

6 has allotted is more than sufficient for them to prepare the

7 analysis.  Indeed, it is more than is provided for under the

8 Patent Local Rules.

9         THE COURT:  All right.  Well, we are not -- since I

10 have not read through the -- or completely digested the letter

11 complaints about each other and what discovery has been done,

12 I'm not going to try to rule and just shoot from the hip right

13 now.

14         But I can tell you -- and Mr. Medlock picked up on

15 this.  From looking at it, it does not appear to me that both

16 sides are getting along very well.  In fact, one of my

17 clerks -- and these, keep in mind, are very young attorneys.

18 One of them has been out of school all of a year and a half,

19 and one of them has been out of school for less than a year.

20 And the first thing they said is, "These guys hate each other."

21         You might consider that because at some point -- at

22 one time I used to practice out where Judge Lucius Bunton was

23 the Judge.  And I'm not sure we want to get into that kind of

24 discovery hearing where basically it doesn't matter what

25 discovery issue comes up; someone pays sanctions.  That's not a

1  good idea.  That's not my idea of the best way to run a case.

2  There were times he felt that was absolutely necessary, and he

3  may have been right.

4          What I'm seeing in these letters is, "Well, they

5  are asking for too much; and, by the way, we're going to give

6  it anyway in April."  Or, "Yes, we did too give it; but if we

7  didn't, it is going to be coming in our forthcoming disclosure"

8  or whatever.  Or, "We've already given it over here; so, we

9  shouldn't have to give it again."

10         There is an indication there that -- I mean, both

11 sides are saying, "Well, no, we shouldn't have to give it.  But

12 really we did because we're not sure how the Judge is going to

13 rule; so, we're a little bit nervous about saying we didn't

14 give it.  So, really we did just in case you're mad at us,

15 Judge."

16         I mean, that's why I'm saying that -- and I think

17 that's where the clerks are getting the idea.  Maybe taking a

18 deep breath and being a little bit honest about what's going

19 on -- you know the kind of discovery that is going to be

20 involved.  And I understand the Defendant's feeling of

21 unfairness that you are trying to respond without knowing

22 exactly what the claims are, and I understand the Plaintiff's

23 feeling of unfairness of having to go forward.  I mean, that's

24 just part of what patent litigation is.  But I'm -- I don't

25 think either side really wants to see what the ruling is going

1 | to be if we continue on in this respect.

2 |         Now, the other thing that doesn't -- is not real

3 | impressive is claims being made and, so, you make the response

4 | and then you say, you know, we gave this on December 25th or

5 | December 26th, the day after Christmas; and we are now here

6 | January 3rd.  Maybe they have read it.  Maybe they haven't.

7 | But on the other hand, if you've got it, you at least know

8 | they've sent something

9 |         I do not have the impression that there has been, I

10 | guess, a fair, adult, good-faith exchange of what are the real

11 | problems and then competent counsel coming and saying, "You

12 | know, we're down to this one last cutting-edge point that we

13 | can't agree on; and we really need a determination, or these

14 | two issues as a matter of law."

15 |         I mean, are these e-mails privileged, or is it

16 | really on your side too extensive to go through every e-mail?

17 | I think that's one of the issues here.

18 |         And, obviously, the question of Plaintiffs is:  Do

19 | you really need every single one of those e-mails?

20 |         And, on the other side:  Do you really have to turn

21 | over all of electronic discovery in formats that no one can

22 | look at from the other side?

23 |         And, you know, can you really not look at them on

24 | your side; or are you just saying that?

25 |         And these are questions -- obviously I can spend a

 1  lot of time going through them, but that's not the best use of

 2  the Court's time. I mean, those are things that counsel can

 3  work out. And I may have to wind up being a little creative,

 4  but it really doesn't work out to either side's benefit or to

 5  your client's benefit of me appointing a special master and

 6  force all of the lawyers to sit down in the same room and don't

 7  come out until the master has sided all of this stuff or turn

 8  it over to the Magistrate to do the same thing or just issue

 9  rulings along with heavy sanctions on both sides. I mean, that

10  just is not how I like to deal with things; and it -- well, it

11  should rub attorneys the wrong way, too. I mean, I didn't like

12  being involved in cases like that when Judges did those kinds

13  of things.

14          So, what I'm going to say is, I've started to look

15  at this. It has just come in. I would expect Defendants -- if

16  you've got real questions or concerns after looking at this

17  supplement that they have presented, which appears on its face

18  to add a lot of additional information and photographs -- if

19  you've got some specific questions, ask them. And please do

20  not get involved in the game of, "Well, I asked him to sit down

21  for a conference" and then your side saying, "Well, I'm not

22  going to sit down. We're not going to have no stinking

23  conferences with them." I mean, that's just not going to work,

24  either.

25          You know, maybe we don't have -- neither side has

 1   time to sit down face-to-face for a conference; but you've sure

 2   got time for a phone call. With this many attorneys on both

 3   sides, somebody has time for a phone call with each other. And

 4   on your side if you've got some additional information, fine;

 5   or if it is going to have to come from the expert or the

 6   experts, then set up the deposition.

 7             Right now what I'm planning to do is go ahead and

 8   have this case set for the *Markman* Hearing as previously

 9   scheduled, and there will be a different schedule as far as the

10   various disclosures and so forth going out on the second case

11   as though today was the management conference.

12             All right. Let me ask from Plaintiff's point of

13   view. Is there anything further that you think could

14   profitably be taken up at this time or needs to be taken up at

15   this time?

16             MR. SHEASBY: Your Honor, I have two final points.

17   One is, I actually wanted to report an issue of commonality

18   which occurred right before the hearing started which is that

19   CIBA has made a commitment to reconstruct e-mail accounts and

20   search those e-mails.

21             THE COURT: Okay.

22             MR. SHEASBY: And the second point is, I know

23   your Honor has issued an Order that we should limit our

24   asserted claims to 20 by, I think, early March, which is after

25   they file their invalidity contentions in the second case. The

1  only thing I would ask -- and it is because I haven't done the

2  analysis -- is, if it is necessary for there to be two or three

3  claims on the north side of 20, I wanted to know what procedure

4  we should use -- or maybe we shouldn't use any procedure

5  because the answer is no -- to ask the Court's leave to have a

6  few additional claims beyond 20.

7              THE COURT:  Well, I think that's -- as in every

8  other case, if there is a real showing of good cause, the Court

9  is not going to be unreasonable.

10             MR. SHEASBY:  I understand.

11             THE COURT:  But the good cause is not, "Gee, we'd

12  really like to have it because it makes it harder for them," or

13  "There is this minute difference between the two that is not

14  going to really help; but, gee, just in case, I don't want to

15  lose a" -- you know, I understand the terrible pressure on

16  lawyers when you've got clients looking over your shoulder and

17  that horrible feeling in your gut when you suddenly realize

18  that, gee, I missed an issue; and now I'm not going to have it

19  on appeal.  Believe me, I know that.  But that's part of your

20  job, is to know what the key issues are and make sure they are

21  out there.

22             MR. SHEASBY:  I understand, your Honor.

23             THE COURT:  But it is part of my job to run the

24  court efficiently and get you a decision in a reasonable amount

25  of time.

*1-3-2007 Scheduling Conference*

44

1           MR  SHEASBY:  I understand.

2           THE COURT:  All right.  Anything from Defendant's

3  point of view that either needs to be or can profitably and

4  helpfully be considered at this time?

5           MR. MEDLOCK:  After hearing your remarks,

6  your Honor, I think the wise thing to do is shut up and sit

7  down.

8           THE COURT:  Well, I would not put it that way

9  but...

10          All right.  I mean, if from Plaintiff's point of

11  view these cases are so complicated that they cannot be handled

12  as I've suggested, then you need to be thinking in terms of

13  separating it out maybe between the edge design and the toric

14  design patents, with one of them having a -- unfortunately,

15  because of my schedule -- quite a bit longer time frame.  I'll

16  offer you that choice as you look at it.  You may still have a

17  limited number because even with the toric I think there are 60

18  or 80 different claims in there; so, that is going to probably

19  wind up being limited anyway.

20          So, you mentioned can I come back with a few more

21  claims.  One question I'll be asking you is, well, then perhaps

22  what we need to do is divide this up and have two *Markman*s and

23  two trials, with the second one being a long way on out there,

24  weighing in mind, as I said before, my reluctance to give a

25  Plaintiff two bites at a Defendant in two different trials.

 1 There is some unfairness there; although, if Defendant agreed

 2 to it, that wouldn't be such a problem. So, you know, think

 3 about that when you are going through this analysis.

 4        In that case, I wish you all a very happy --

 5        Yes, Mr. Dark?

 6        MR. DARK: Judge, I just thought of something. It

 7 would probably be good, just as a matter of record and to clear

 8 it with you, that discovery in either one of these cases would

 9 be admissible in the other case or that --

10        THE COURT: Any objections to that from Defendant?

11        MR. DARK: I haven't had a chance to talk to them.

12 It just occurred to me that--

13        MR. MEDLOCK: No.

14        THE COURT: Okay. Discovery in one case will apply

15 to the other case and vice versa. And, for that matter, it's

16 very likely that a claim construction in one patent in the

17 toric is very likely to be the same claim construction in one

18 of the continuations, the later ones, unless there is a real

19 good reason -- such as the applicant being his own

20 lexicographer -- that I shouldn't define the same term within

21 the same group. Now, that may not be so true with an edge

22 design patent and toric patent; but any one of the toric

23 patents, it would seem -- and I haven't analyzed it yet, but it

24 would seem very likely that I'm going to be defining those

25 pretty much the same all of the way through.

1        In that case I wish you all a very good new year.

2  I look forward to working with all of you because we've got, I

3  think, a bunch of cases with all of you.  You are excused, and

4  the court is in recess.

5        [PROCEEDINGS CONCLUDED, 3:11 P.M.]

6  COURT REPORTER'S CERTIFICATION

7        I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT

8  TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

9  _____          JANUARY 4, 2007

10 CHRISTINA L. BICKHAM, RMR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25